UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESAU BURIEL,

                Petitioner,                Case Number 2:13-cv-11703
                                              Honorable Sean F. Cox

WILLIE SMITH,

                Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS,
DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING PERMISSION TO
APPEAL *IN FORMA PAUPERIS***

        This matter is before the Court on Petitioner Esau Buriel's petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. Petitioner was convicted in the Saginaw Circuit Court of first-degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a)), and carrying a weapon with unlawful intent. MICH. COMP. LAWS§ 750.226. As a result of these convictions, Petitioner was sentenced as a fourth-time habitual felony offender to a non-parolable life sentence for the first-degree murder conviction, and a parolable life sentence for the weapon conviction. The petition raises three claims: (1) Petitioner's trial was rendered fundamentally unfair by a twenty-year pre-indictment delay by the prosecution; (2) Petitioner's ex post facto rights were violated by allowing the state to convict Petitioner with evidence that would not have been admissible when the crime occurred; and (3) Petitioner's convictions ran against the great weight of the evidence. The Court finds that Petitioner's claims are without merit. Therefore, the petition will be denied. The Court will also deny Petitioner a certificate of appealability and permission to proceed on appeal *in forma pauperis*.

## I. Facts and Procedural History

On February 8, 1989, The victim, Kim Currington, was beaten and stabbed to death in a home she shared with Petitioner. Petitioner was not charged with her murder until July 7, 2009, more than twenty years later.

Soon after proceedings began in the state circuit court, Petitioner's trial counsel moved for dismissal of the case on grounds of pre-indictment delay. Counsel stated, however, that he did not want the court to rule on the motion until after he conducted discovery and could demonstrate that the defense was prejudiced by the delay. The court authorized funds for a private investigator to assist Petitioner.

At further pretrial hearings, defense counsel stated that the prosecutor and police were cooperating in trying to reconstruct the twenty-year-old investigation. Counsel was having difficulty obtaining the victim's children's counseling records, and further funds were authorized by the court to assist in locating the records. The trial court also authorized funds for the defense to hire an odontology expert to examine the bite-mark evidence.

At trial, the victim's oldest son, Archie Currington, testified that he was about nine years old when his mother was killed. He testified that he remembered Petitioner physically fighting with the victim and whipping the children when he lived with his family. Recalling the morning of the murder, Archie testified that he heard Petitioner and his mother arguing in their bedroom as he and his siblings were preparing to walk to school. Archie peeked in to the bedroom and saw Petitioner standing over his mother with a knife , who was lying on the bed. His mother's jeans were slit on the leg, and Archie saw blood flowing from the wound. The victim tried to stand, but Petitioner pushed her back down.  Seeing Archie in the doorway, she yelled at him to take his siblings to

-2-

school. Archie grabbed his six-year-old brother, David, and his seven-year-old sister, Nikki, and walked them to school.

When he arrived at school, Archie did not tell anyone about the fight at home because he was accustomed to it. At lunchtime, Archie walked his brother home from his half-day at school. There he found his mother dead in her bedroom, lying with blood spread over the walls. He walked his brother back to school and told staff about what he had seen at his house.

Archie testified that he never told the police about the fight on the morning of the murder because he was afraid of Petitioner. After the funeral, the children moved to Minnesota to live with their Aunt Carol. Archie testified that he told his aunt what he saw on the morning of the murder, but he was never again contacted by the police. He and his siblings saw counselors in Minnesota. He doubted that he told the counselor anything about what he saw the morning before the murder. Archie explained that he never went to the police after he matured because he did not think they cared about the case.

Nikki Currington testified that she heard the argument and saw the knife and the blood on her mother on the morning of the murder. She recalled telling her Aunt Carol about the incident "in bits and pieces." She did not know whether she told the counselor anything about what she saw.

David Currington testified that he was in kindergarten when his mother was killed. He testified that he recalled his mother fighting with Petitioner while they lived together. On the day of the murder, he recalled his brother walking him home and finding the back door of the house locked. They had to push the couch away from the front door to open it. His brother stopped him from going into the bedroom and walked him across the street.

David Ezell, the father of children, testified that they complained about Petitioner hitting

them. When he talked to Kim Currington about it at a bar, Petitioner approached and told him "somebody gonna die up in here." Prior to the murder, Ezell was in jail where he received a letter from Currington that she planned to move to Minnesota in late January of 1989.

Carol Jackon testified that she was the victim's sister and lived in Minnesota at the time of the offense. In January of 1989 she spent the night at the victim's house. While there, she noticed that her sister was nervous. They decided that Kim would move back to Minnesota early in February after she received her ADC check.

Jackson testified that about a week after the murder, Archie told her that Petitioner had stabbed his mother in the leg. Jackson opined that the children were in "pretty bad shape" psychologically after the death of their mother. On February 14, 1989, she gave a recorded statement to the police. On September 12, 1982, Nikki told her that she saw Petitioner stab her mother in the leg. Jackson told the police about the statement.

Police witnesses testified that they found the victim's body in the bedroom, She had been stabbed and struck on the head with a blunt object. There were no signs of forced entry or unusual disarray. Officers discovered footprints in the snow behind the house, but they were never able to make a match to any footwear. No weapon was found in the house or outside. Officers seized multiple items from the house, and they made note of the fact that there was no hammer among tools found in a toolbox.

While officers were at the house, Petitioner returned with Rayna Matthews. Petitioner explained that he had sent Matthews with cigarettes to deliver to Currington, but when Mattews saw police cars at the house, she returned and went back to the house with Petitioner. Petitioner told police that he last saw the victim between 8:15 and 8:20 that morning when he left for work.

-4-

Petitioner and Matthews were taken to the police department for questioning. There were no apparent injuries to Petitioner's hands and fingernails. An impression was made of Petitioner's teeth by a dentist. Petitioner's clothing was seized and examined for blood, but none was found. A forensic examination of his pocket knife tested negative for blood.

An autopsy of the victim revealed numerous lacerations. The cause of death was seven impact wounds to the head, two or three of which fractured the skull, caving it in. There was evidence of possible bites to the chest and arm. A forensic odontologist could not exclude Petitioner as a source of the bite marks, but neither could he make a positive identification.

The detective in charge of the original investigation, Ronald Rousseau, testified that he left the department in 1991 because of health concerns. He described the children as being terrified and unable to speak about what they saw. After the children moved to Minnesota, he spoke with Jackson on the phone, and she told him that Archie mentioned that he saw Petitioner stab his mother. Nevertheless, he didn't go forward with the investigation because the children still wouldn't talk openly about what happened. Rousseau thought the children needed time and counseling before they would be able to testify. Eventually, though, health concerns forced Rousseau to retire. Years later he was contacted by a cold-case investigator about a different case, but Rousseau asked the new investigator look into Petitioner's case.

A report from Rousseau's partner indicated that the oldest child told his Aunt Jackson that Petitioner stabbed his mother, but the child could not say which day it occurred. The report indicated that the middle child just cried. Two months later Jackson told investigators that the middle child said that her mother walked her half way to school and said she was going to mall on the morning of the murder. Defense counsel used these prior inconsistent statements to impeach the credibility

of the victim's children at trial.

Linda Box, who dated Petitioner in the early 1990's, testified that Petitioner was very jealous and hit her. Another woman who dated him for four-to-five years, Opal Campbell, testified Petitioner once pushed her to the ground and hit her with a bottle. He also once tried to bite her finger. She opined that Petitioner was a jealous man and had an "evil rage."

Based on this evidence Petitioner was convicted and sentenced as indicated above.

Following his conviction and sentence, Petitioner filed a claim of appeal in the Michigan Court of Appeals, raising the following claims:

> I. The trial court erred by denying the defense's motion to dismiss the charges based on the unreasonable prearrest delay of over twenty years, thereby denying Buriel his right to due process, to a fair trial, to present a defense, and to confront the witnesses and evidence against him causing substantial prejudice at trial.
>
> II. Mich. Comp. Laws 768.27b is an unconstitutional ex post facto law violating U.S. Const. art. I, § 10, because it allowed the state to convict Buriel on less or different testimony than the rules of evidence required at the time of the alleged commission of the offenses.
>
> III. Mich. Comp. Laws 768.27b conflicts with Mich. R. Evid. 404(b), violates the fundamental right of presumption of innocence and unconstitutionally infringes on the Supreme Court's authority to create rules to protect due process rights. Because Mich. R. Evid. 404(b) is a rule intended to ensure a criminal defendant a fair trial by barring propensity evidence, it takes precedence over Mich. Comp. Laws 768.27b, which limits the fair trial right by admitting propensity evidence.
>
> IV. The trial court denied Buriel due process and a fair trial by allowing the prosecution to introduce similar acts evidence.
>
> V. Buriel is entitled to a new trial where his convictions are against the great weight of the evidence.

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion.

*People v. Buriel*, 2012 WL 3196085 (Mich. Ct. App. Aug. 2012).

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme

Court, raising the following claims:

> I. The trial court erred by denying the defense's motion to dismiss the charges based on the unreasonable pre-arrest delay of over twenty years, thereby denying Buriel his right to due process, to a fair trial, to present a defense, and to confront witnesses and evidence against him causing
> substantial prejudice at trial.

> II. Mich. Comp. Laws 768.27b is an unconstitutional ex post facto law violating U.S. Const. art. I, § 10, because it allowed the state to convict Buriel on less or different testimony that the rules of evidence required at the time of the alleged commission of the offenses.

> III. Buriel is entitled to a new trial where his convictions are against the great weight of the evidence.

The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Buriel*, 493 N.W.2d 938 (Mich. 2013) (table).

## II. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal

-8-

courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*, at 786-787.

### III. Analysis

#### A. Pre-Indictment Delay

Petitioner's first claim asserts that his Fifth Amendment right to due process was violated because of the twenty-year delay in charging him. Respondent argues that the Michigan Court of Appeals reasonably rejected the claim.

The Supreme Court has held that "[t]here is no constitutional right to be arrested." *Hoffa v. United States*, 385 U.S. 293, 310 (1966). The *Hoffa* Court explained:

> The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*Id.*

The Due Process Clause of the Fifth Amendment provides a defendant limited protection

-9-

against pre-indictment delay. *United States v. Lovasco*, 431 U.S. 783, 789 (1977). The prosecution of a defendant does not necessarily deprive him of due process, even if his defense is somewhat prejudiced by the lapse of time. *Id.* at 796. The Supreme Court has indicated that, although statutes of limitations provide the "'primary guarantee against bringing overly stale criminal charges,'" where preindictment delay is involved "the Due Process Clause has a limited role to play in protecting against oppressive delay." *Lovasco*, 431 U.S. at 789 (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)).

> The Sixth Circuit
>
> has consistently read *Lovasco* to hold that '[d]ismissal for pre-indictment delay is warranted only when the defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage.'

*United State v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992) (quoting *United States v. Brown*, 667 F.2d 566, 568 (6th Cir. 1982) (per curiam)) (emphasis and alterations in original). A defendant bears the burden of proof that the delay caused substantial prejudice to his right to a fair trial and that the delay was for the purpose of gaining a tactical advantage over him. *Marion*, 404 U.S. at 322.

In this case, Petitioner has established neither prong of the *Lovasco* test. First, Petitioner has not shown that the prosecutor delayed bringing the charges against Petitioner for the purpose of gaining some sort of tactical advantage. The record shows that the detective in charge of the investigation was unable to obtain statements from the children who saw the initial assault on the victim. While the children may have been able to convey some of what they saw to their aunt, they were unable to specify a time or to consistently describe what they saw. The investigator felt that the children needed counseling before they would be able to sufficiently describe what they saw. *See Mayo v. Burge*, 2003 WL 21767767 (S.D.N.Y. July 30, 2003) (Petitioner failed to show entitlement

-10-

to relief where prosecution showed that the principal reason for the delay was the reluctance of a nine-year-old prosecution witness to testify or cooperate, rather than any attempt to gain a tactical advantage).

Within a few years after the initial investigation, the detective retired due to a medical condition, and inexplicably the investigation was abandoned. It was only after funds became available to pursue so-called "cold cases" that the investigation was renewed. At that point the children of the victim–then adults–were able to recall and testify about Petitioner's actions on the morning of their mother's murder.

Accordingly, there is absolutely no record evidence that the prosecutor put the investigation on hold or purposely delayed charging Petitioner with the intent to gain some tactical advantage. Rather, it appears that the delay in charging Petitioner resulted from the inability of the young witnesses to testify and the investigating agency's perhaps negligent failure to assign a new detective to the case following Rousseau's retirement to made periodic inquiries regarding the children's ability to testify.

Nor has Petitioner demonstrated that he was prejudiced by the delay. Petitioner's trial counsel initially moved for dismissal of the charges but asked for a delay in the ruling pending his investigation. The motion was never renewed, and therefore Petitioner never presented the trial court with a basis for showing that he was prejudiced by the delay. Indeed, Petitioner's brief does not identify any particular witness or piece of evidence that was lost due to the delay. While it is true that the Petitioner did not present any defense witnesses at trial, there was no complaint made after the prosecution rested that there were witnesses that he would have liked to testify but were no longer available. Review of record likewise does not reveal how the delay prejudiced Petitioner's

-11-

ability to cross-examine the prosecutor's witnesses.

Accordingly, Petitioner has not demonstrated that the delay in bringing charges against him resulted from the prosecutor's intent to gain a tactical advantage or that he was prejudiced by the delay. The claim is therefore without merit.

**B. Ex Post Facto**

Petitioner's second claim asserts that his ex post facto rights were violated because prior acts evidence was admitted under Michigan Compiled Laws § 768.27, a statute that was not promulgated until after the crime was committed.

Article 1, § 10 of the United States Constitution prohibits states from passing ex post facto laws. In *Collins v. Youngblood*, 497 U.S. 37 (1990), the Supreme Court explained that the Ex Post Facto Clause of the U.S. Constitution incorporated "a term of art with an established meaning at the time of the framing of the Constitution." *Id.* at 41. In connection with this interpretation, the Court held that the Clause targets laws that "retroactively alter the definition of crimes or increase the punishment for the criminal act." *Collins*, 497 U.S. at 43 (citing to *Calder v. Bull*, 3 U.S. (Dall.) 386, 391-392, 1 L. Ed. 648, 3 Dall. 386 (1798); *Beazell v. Ohio*, 269 U.S. 167, 169-170 (1925)). To fall within the ex post facto prohibition, a law must be retrospective, i.e.; "it must apply to events occurring before its enactment" and it "must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29 (1981). Thus, an ex post facto law is one which: (1) punishes an act previously committed as a crime, although the act was not a crime when done; (2) increases the penalty for a crime after its commission; and (3) deprives a defendant of any defense which was available at the time the act was committed. *See Collins*, 497 U.S. at 52.

Generally, the admission in a criminal trial of evidence of a defendant's acts other than those

-12-

with which he is charged is governed by Rule 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MICH. R. EVID. 404(b)(1). In 2005, after the conduct at issue in this case occurred, the Michigan legislature enacted § 768.27, which became effective on January 1, 2006, as a supplement to Rule 404(b). Section 768.27b provides, in relevant part, that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403." MICH. COMP. LAWS § 768.27b(1).

In *Carmell v. Texas*, 529 U.S. 513 (2000), the Supreme Court considered a Texas rule which abolished the requirement of corroboration of a victim's testimony before a defendant could be convicted of sexual assault. *See id*. at 516. The Court held that retroactive application of this rule was an ex post facto law because it "changed the quantum of evidence necessary to sustain a conviction." *Id*. at 530. The court noted that the rule did not simply regulate the mode by which evidence is presented to the jury, but rather the sufficiency of the prosecutor meeting the burden of proof. *See id*. at 545. The Court was careful to note, however, that ordinarily rules of evidence do not constitute an ex post facto law under the fourth *Calder* formulation. The court explained that such rules do not "necessarily affect, let alone subvert, the presumption of innocence. The issue of the admission of evidence is simply different from the question whether the properly admitted evidence is sufficient to convict the defendant." *Id*. at 546. As the Court explained:

> We do not mean to say that every rule that has an effect on whether a defendant can

be convicted implicates the Ex Post Facto Clause. Ordinary rules of evidence, for example, do not violate the Clause. Rules of that nature are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case. More crucially, such rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption. Therefore, to the extent one may consider changes to such laws as "unfair" or "unjust," they do not implicate the same kind of unfairness implicated by changes in rules setting forth a sufficiency of the evidence standard.

*Id*. at 533 n.23.

Here, the rule implemented by § 768.27b is a procedural rule governing the admissibility of evidence; it does not, as in *Carmell*, in any way change the prosecutor's burden of proof or the sufficiency of the evidence necessary to meet that burden. *See Schroeder v. Tilton*, 493 F.3d 1083, 1088 (9th Cir. 2007) (California statute permitting introduction of evidence of prior uncharged sexual misconduct did not alter the quantum of proof necessary to sustain conviction, and thus did not constitute an ex post facto law). Accordingly, Petitioner's ex post facto rights were not implicated by the application of this rule of evidence to his case. Petitioner is not entitled to habeas relief on this claim.

**C. Great Weight of the Evidence**

Finally, Petitioner asserts that he is entitled to a new trial on the grounds that the verdict was against "the great weight of the evidence."

A federal habeas court has no power to grant a habeas petition on the grounds that the state conviction is against the great weight of the evidence. *Cukaj v. Warren*, 305 F. Supp. 2d 789, 796 (E.D. Mich. 2004) (citing *Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985); *Crenshaw v. Renico*, 261 F. Supp. 2d 826, 834 (E.D. Mich 2003); *Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002)); *see also Artis v. Collins*, 14 F. App'x 387 (6th Cir. 2001) (declining to grant a

-14-

certificate of appealability on the petitioner's claim that the jury's verdict was against the manifest weight of the evidence). Thus, Petitioner's great-weight-of-the-evidence claim is not cognizable on habeas review.

### IV. Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id.* at 336-37.

The Court concludes that a certificate of appealability is not warranted in this case because reasonable jurists could not debate the Court's assessment of his claims. Furthermore, the Court will deny Petitioner permission to appeal *in forma pauperis*, because any appeal would be frivolous.

### V. Conclusion

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

-15-

**IT IS FURTHER ORDERED** that permission to appeal *in forma pauperis* is **DENIED**.


Dated:  October 22, 2014                    S/ Sean F. Cox _____
                                            Sean F. Cox
                                            U. S. District Judge


I hereby certify that on October 22, 2014, the foregoing document was served on counsel of record via electronic means and upon Esau Buriel via First Class mail at the address below:

Esau Buriel 174568
Oaks Correctional Facility
1500 Caberfae Highway
Manistee, MI 49660

                                            S/ Jennifer McCoy _____
                                            Case Manager

-16-